# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 16-0731V
Filed: March 20, 2019
PUBLISHED

| | |
|---|---|
| COURTNEY P. BINETTE,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH<br>AND HUMAN SERVICES,<br><br>               Respondent. | Special Processing Unit (SPU);<br>Ruling Awarding Damages; Pain and<br>Suffering; Influenza (Flu) Vaccine;<br>Shoulder Injury Related to Vaccine<br>Administration (SIRVA) |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.*
*Robert Paul Coleman, III, U.S. Department of Justice, Washington, DC, for respondent.*

## RULING AWARDING DAMAGES – SPECIAL PROCESSING UNIT[1]

**Dorsey**, Chief Special Master:

On June 22, 2016, Courtney P. Binette ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu")

---

[1] The undersigned intends to post this ruling on the United States Court of Federal Claims' website. **This means the ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this published ruling contains a reasoned explanation for the action in this case, undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

vaccine she received on October 22, 2015.[3]  Petition at 1.  The case was assigned to the Special Processing Unit of the Office of Special Masters.

On March 13, 2018, the undersigned issued a ruling finding petitioner entitled to compensation.  (ECF No. 37).  A damages order was issued on March 14, 2018.  (ECF No. 38).  The parties were unable to reach an agreement on the appropriate amount to award Ms. Binette for her pain and suffering.  For the reasons discussed below, the undersigned finds that petitioner should receive an award for actual pain and suffering in the amount of $130,000.00 and an award for future pain and suffering in the amount of $1,000.00 per year, for petitioner's remaining life expectancy of 57 years.[4]  The basis for this determination is set forth below.

## I.     Procedural History

Ms. Binette filed her petition for compensation on June 22, 2016.  (ECF No. 1).  Two days later, she filed seven medical record exhibits and a Statement of Completion.  (ECF No. 6-7).

On September 12, 2016, respondent filed a status report stating that he was willing to engage in discussions regarding a potential settlement and the parties began discussions to determine if an informal settlement was possible.  (ECF No. 11).  On October 24, 2016, petitioner filed a status report stating that she was unable to formulate a demand because she was continuing "to experience severe and ongoing left shoulder pain."  (ECF No. 13).  Petitioner stated that she intended to forward a demand to respondent once the scope of her treatment and future medical needs were more fully known.  *Id*.  On November 23, 2016, petitioner confirmed that a demand had been sent to respondent.  (ECF No. 16).

On December 30, 2016, petitioner filed a status report stating that although the parties had been in settlement discussions, petitioner recently learned that she may need extensive shoulder surgery to treat her injury.  (ECF No. 18).  The parties agreed to resume settlement discussions after petitioner's upcoming appointment with her orthopedic surgeon.  *Id.*

Over the next six months, the parties continued their attempts to informally resolve this case.  On March 1, 2017, respondent's counsel requested issuance of the 15-week stipulation order, stating that the parties had reached a tentative agreement in

---

[3] The petition and vaccination record (petitioner's exhibit 1) both list the date of vaccination as October 25, 2015.  However, during the hearing, petitioner testified that the date of vaccination was October 22, 2015.  Petitioner testified that she was certain of the October 22, 2015 vaccination date because October 25, 2015 fell on a Sunday.  At time of vaccination, petitioner worked at a bank that would not have been open on Sunday.  Petitioner thereafter filed exhibit 28, a flu shot schedule prepared by her employer listing the times that each employee was scheduled to receive the flu vaccine on October 22, 2015.  This document provides preponderant evidence to support Ms. Binette's claim that she received the vaccination on October 22, 2015.  Therefore, the undersigned finds that petitioner received the flu vaccination at issue in this case on October 22, 2015.

[4] Based on petitioner's birth date of June 15, 1991, petitioner is expected to live for approximately 57 additional years.  *See* Nat'l Ctr. For Health Statistics, United States Life Tables, 2015 (2018) at Table A.

the case.  (ECF No. 25).  However, on June 13, 2017, respondent filed a status report stating that "[t]he authorized representative of the Attorney General ha[d] declined to grant settlement approval for the proposed tentative settlement in this case."  (ECF No. 26).  The parties requested a status conference to discuss further proceedings.  *Id.*  The 15-week stipulation order was subsequently withdrawn.  (ECF No. 28).

On July 17, 2017, the undersigned held a status conference with the parties.  Counsel for petitioner stated that the parties had spent a large amount of time valuing the damages of the case and that petitioner was not open to accepting a lower amount than what the parties had tentatively agreed to.  With the agreement of the parties and to help the parties move the case towards resolution, the undersigned briefly reviewed petitioner's medical history and medical records and made a preliminary finding, stating that petitioner's claim qualified as a SIRVA injury.  Respondent's counsel requested the opportunity to file a brief to set forth respondent's position on the case.  The undersigned granted this request and a scheduling order was issued setting forth deadlines for briefing.  (ECF No. 27).

On September 18, 2017, petitioner filed a Motion for Ruling on the Record.  (ECF No. 32).  Respondent filed a responsive brief on October 18, 2017.  (ECF No. 35).  In his brief, respondent noted that petitioner's claim was filed prior to the Table amendment adding the SIRVA injury to Vaccine Injury Table, and thus, would not be entitled to a presumption of vaccine causation and must proceed on a theory of causation-in-fact.  *Id*. at 6.  Respondent also argued that the record provided insufficient proof that "petitioner experienced the onset of pain within forty-eight hours of vaccine administration" and thus, would not qualify as a SIRVA injury.  *Id*. at 7.  Respondent stated that petitioner's claim must be substantiated by her medical records or a credible medical opinion because petitioner's orthopedist's opinion rested solely upon petitioner's representations without independent evidence to support the assertions.  *Id*.  Respondent also argued that petitioner's recollections of the onset of her injury were inconsistent, contradictory and "cast[] doubt on petitioner's ability to recollect other dates from a similar time period."  Finally, respondent argued that petitioner failed to file an expert report providing a theory of causation and thus, she should not be found entitled to compensation under the terms of the Vaccine Act.  *Id*. at 9-10.

On December 20, 2017, the undersigned issued a scheduling order and filed two court exhibits, informing the parties that she intended to rely on two medical journal articles discussing SIRVA: B. Atanasoff et al., *Shoulder injury related to vaccine administration (SIRVA)*, 28 Vaccine 8049 (2010), filed as **Court Exhibit I**, and M. Bodor and E Montalvo, Vaccination Related Shoulder Dysfunction, 25 Vaccine 585 (2007), filed as **Court Exhibit II**.  (ECF No. 36).  The parties were granted an additional 30 days to respond to these exhibits or file any additional evidence for consideration.  *Id*.  No additional evidence or responses were filed and the undersigned issued a ruling on entitlement in petitioner's favor on March 13, 2018.  (ECF No. 37).  A damages order was issued and the parties were ordered to begin the process of resolving damages.  (ECF No. 38).

The parties were unable to reach a resolution on the appropriate amount of damages, specifically, the amount to be awarded for petitioner's pain and suffering. (ECF Nos. 39-40). To resolve the issues of damages, a damages hearing was scheduled. (ECF Nos. 40-41).

The parties filed their respective pre-hearing submissions on October 5, 2018 (ECF Nos. 44-48), and a damages hearing was held in Washington, D.C., on October 30, 2018. This matter is now ripe for adjudication on the issue of damages.

## II.     **Medical History**

On October 22, 2015, Ms. Binette (age 24) received a flu vaccine in her left shoulder during an onsite wellness program provided by her employer. Ms. Binette is a manager of a collections department at St. Mary's Bank located in Manchester, New Hampshire. Petition at 1; Petitioner's Exhibit ("Pet. Ex.") 1 at 1; Pet. Ex. 8 at 1; Tr. 9. St. Mary's Bank had engaged Rite Aid Pharmacy to offer onsite vaccinations to its employees as part of the bank's wellness program. Petition at 1. Ms. Binette's medical history is significant for migraines, gastritis and depression. *Id.*; Pet. Ex. 2 at 3. Her medical history does not mention any history of shoulder injuries and does not otherwise appear to be contributory to her claim in this case.

After receiving the vaccination in her left arm (her non-dominant arm), Ms. Binette noticed that the band-aid that covered the injection site was "at the top of my shoulder." Tr. 26. She described her arm as feeling immediately "tender" and "sore" and two days later, she "couldn't lift [her] arm and it just was so tight and so sore." Tr. 26; Pet. Ex. 8 at 1 ("[t]wo days after the injection I began to have pain in my left shoulder and arm.") Ms. Binette stated that she experienced pain when lifting her left arm and was unable to sleep due to the pain. Pet. Ex. 8 at 1.

Fifteen days later, on November 9, 2015, Ms. Binette presented to nurse practitioner, James Giordani, at the office of her primary care physician, Elliot Family Medicine, with complaints of joint pain and a limited range of motion ("ROM") of her left shoulder since receiving the flu shot. Pet. Ex. 3 at 18. Ms. Binette reported that she was having difficulty with all activities and sleeping. *Id*. The notes from this visit state that petitioner "received a flu shot to the left shoulder and a few days after the shot she has had pain, decreased range of motion and mild swelling without redness." *Id*. at 19. Ms. Binette reported the pain as "mild" with "aching" and "cramping" and she stated that she was taking nonsteroidal anti-inflammatory drugs (NSAIDS) for her symptoms with only mild relief. *Id*. On examination, Ms. Binette exhibited decreased ROM and tenderness. *Id*. at 20. Swelling was noted and she was assessed with acute bursitis of the left shoulder. *Id*. at 21. Ms. Binette was instructed to continue taking Ibuprofen, to gently stretch the shoulder, and rest and ice the area for one week. She was prescribed a Medrol Dose pack and instructed to return if there was no improvement for a physical therapy referral. *Id*. Ms. Binette stated in her affidavit that Nurse Giordani "concluded that my pain was likely the result of an improperly administered flu vaccine." Pet. Ex. 8 at 2. She stated that she took the prescribed steroids, but there was no improvement in

4

her range of motion.  *Id*.  In her affidavit, Ms. Binette rated her level of pain at this time as a 10/10.  *Id.*

On November 19, 2015, Ms. Binette underwent an initial evaluation for physical therapy.  Pet. Ex. 4 at 48.  In the assessment, it is noted that Ms. Binette was being referred for left shoulder bursitis which impaired her sleep, lifting, reaching and participation in yoga.  *Id*.  The notes indicated that petitioner would benefit from skilled physical therapy and that she demonstrated good rehabilitation potential.  *Id*.

On December 11, 2015, Ms. Binette presented to Dr. Jennifer L. Hendricks at Elliot Family Medicine with continued complaints of left shoulder pain which persisted for the past seven weeks despite steroid treatment and physical therapy.  Pet. Ex. 3 at 12-13.  Ms. Binette reported that the vaccine was given high on her shoulder with pain localized to the injection area.  She also stated the oral steroids had only caused her to sweat and did not help with her pain.  *Id*.  Ms. Binette stated that there had been no improvement in her range of motion with the physical therapy.  She reported her pain level as severe, at 10/10 at times and she felt nauseous with pain until she was able to maneuver her arm into a relaxed position.  *Id*.  She reported that she was still able to perform yoga "at baseline" but was unable to perform certain specific movements.  *Id*.  On examination, Dr. Hendricks noted that Ms. Binette "appear[ed] to be in pain with limited ROM of left shoulder apparent."  *Id*. 15.  Ms. Binette's internal and external rotational movements were intact, however, and she had a negative Hawkins's impingement sign.  *Id*. at 16.  She was given a referral to an orthopedist for evaluation.  *Id*.

On January 5, 2016, Ms. Binette presented to Sara Lupien, PAC, at Elliot Orthopedic Surgery Specialists complaining of left shoulder pain since receiving a flu vaccination on October 22, 2015.  Pet. Ex. 2 at 1.  Ms. Binette complained that although she had been in physical therapy for the past six to seven weeks, she continued to experience moderate and constant left shoulder pain.  *Id*.  A physical examination revealed mild tenderness to palpation over the anterior lateral area of the left shoulder.  Pet. Ex. 2 at 4.  The range of motion testing revealed "80 degrees of abduction, 45 degrees of adduction, forward flexion to 180 degrees, extension of 45 degrees, internal rotation of 55 degrees, and external rotation of 40 degrees. Strength testing reveals 4/5 in abduction, adduction, internal rotation, external rotation, flexion and extension.  No scapular winging is noted. Drop arm test is painful and negative."  *Id*.  Ms. Binette underwent an x-ray which did not reveal any abnormalities.  *Id*.; Pet. Ex. 2 at 9.  She was assessed with left rotator cuff tendinitis and received a cortisone injection in her left shoulder to treat the pain.  *Id*. at 5-6.  Ms. Binette was encouraged to continue attending physical therapy.  *Id*. at 6.

Ms. Binette attended nine physical therapy sessions from November 19, 2015 to March 8, 2016.  Pet. Ex. 4.  By the end of December 2015, Ms. Binette reported that her symptoms had improved, she was sleeping better, and had a "much improved ROM."  Pet. Ex. 4 at 22.  On February 11, 2016, Ms. Binette reported to her physical therapist that while her left shoulder pain was not constant, her range of motion had not returned

to baseline and she had received no benefit from the most recent cortisone injection. Pet. Ex. 4 at 3. The assessment noted that Ms. Binette had symptoms of declining active ROM, persistent pain and limited function. She also had cervical/periscapular pain as a result of compensating for her shoulder weakness. *Id*.

On February 15, 2016, Ms. Binette presented to Dr. Hendricks with continued complaints of left arm pain and decreased range of motion of her left shoulder. Pet. Ex. 3 at 2-3. She reported that the most recent steroid injection had improved her pain and ROM for only one day. *Id*. at 3. Ms. Binette stated that she had completed six weeks of physical therapy with some improvement in her ROM, but she still had limited flexion and abduction. *Id*. She felt that her strength was decreasing in her left arm due to restricted use and the pain was now radiating into her left bicep. Ms. Binette inquired whether she should have imaging performed. *Id*. On examination, Dr. Hendricks noted decreased passive and active range of motion of the left shoulder. Ms. Binette's left shoulder was also tender to the anterior lateral aspect and her strength was measured at 4/5. *Id*. Ms. Binette was assessed with decreased ROM of the left shoulder and adhesive capsulitis. Cervical radiculopathy was considered but ruled out given the presenting symptoms. *Id*. Orders for imaging were deferred to petitioner's orthopedist for further evaluation. *Id*.

Ms. Binette underwent an MRI of her left shoulder on February 21, 2016. Pet. Ex. 2 at 8. The MRI revealed no evidence of subcutaneous or muscle irregularity, but there was evidence of tendinopathy of the supraspinatus, infraspinatus and subscapularis tendons of the left shoulder. *Id*.

On February 26, 2016, Ms. Binette presented to Dr. Mark Piscopo, an orthopedic surgeon at Elliott Hospital for an assessment of her left shoulder. Pet. Ex. 6 at 7. She reported that she was regularly attending physical therapy but was still experiencing left shoulder pain. *Id*. On examination, Dr. Piscopo noted that there was no obvious swelling or deformity and he saw no indication of where the flu shot was administered. *Id*. There was palpation about the left shoulder which "revealed some moderate tenderness locally over the lateral aspect of the humeral head and subacromial interval." *Id*. at 7-8. He noted moderate pain but "reasonable strength to resisted shoulder internal rotation, resisted external rotation, as well as resisted abduction." *Id*. at 8. Dr. Piscopo reviewed Ms. Binette's MRI and x-ray results and noted the focal area of rotator cuff tendinosis in the supraspinatus tendon. *Id*. In the "Plan" section of the notes, Dr. Piscopo stated:

> I advised regarding her MRI findings and advised her that the most likely explanation for her continuing pain symptoms is that the [vaccine] was administered too high on the shoulder and some of the vaccine was likely injected into the rotator cuff causing this rotator cuff tendinosis. I advised her that this falls into the category of shoulder injury related to vaccine administration (SIRVA). I advised her that based on experience with some of the newer vaccine products I advised her that it is likely going to take a relatively extended period of time for the symptoms to resolve. I advised

6

> her that beyond the treatment measures that she has received there does
> not appear to be any other intervention that is indicated at this time. I
> advised her that continuing with range of motion strengthening exercise[s]
> for her shoulder remains appropriate and if she does develop significant
> flareups, repeated cortisone injections or oral steroids, or even return to
> physical therapy may need to be considered. We will plan to see her as
> needed.

*Id*. On March 2, 2016, Ms. Binette called Dr. Piscopo asking if she could return to yoga. She requested a letter specifying which exercises she "may or may not do." Pet. Ex. 6 at 3. Dr. Piscopo advised Ms. Binette that she could engage in yoga, but she would need to avoid positions that caused her discomfort. *Id*.

Ms. Binette was discharged from physical therapy on March 8, 2016 after completing nine visits. Pet. Ex. 4 at 4. It was noted that the physical therapist had not seen Ms. Binette since February 11, 2016. *Id*. Under "Patient's Status at Time of Discharge" it states: "Subjective: It doesn't hurt all the time but still doesn't move all the way, no benefit from cortisone shot." *Id*. In the assessment, Ms. Binette is noted to have attained all LTGs (long-term goals) and she returned to yoga, which had been her only remaining LTG. *Id*.

On March 31, 2016, Ms. Binette presented to orthopedist, Dr. Douglas Goumas, at the New Hampshire Orthopedic Center to obtain a second opinion regarding her left shoulder injury. Pet. Ex. 5. Ms. Binette reported that she had received a flu vaccination in October 2015 and had ongoing shoulder pain since that time. Pet. Ex. 5 at 2. Dr. Goumas noted that Ms. Binette "was seen at Elliot Orthopedics and was advised would need to 'live with this for the rest of her life…. was advised to get 2nd opinion.'" *Id*. Dr. Goumas also noted that Ms. Binette had retained an attorney and that "I was not aware, but there are a number of individuals who have had flu shots resulting in decreased range of motion. Again, I do not have a lot of experience with that…" *Id*. at 15. On examination, Dr. Goumas documented that Ms. Binette had good range of motion of her head and neck, and there was no radiculopathy. *Id*. He did note, however, that she had limitations with external rotation and limitations with motion and pain. He documented that Ms. Binette had "significant pain with abduction, internal and external rotation." The diagnosis was "[s]houlder pain consistent with adhesive capsulitis, Stage I." *Id*. Dr. Goumas stated, "I am uncertain of the connection between the flu shot and the adhesive capsulitis diagnosis that I am making with Courtney. However, we will get her in for an IA injection to address her adhesive capsulitis and she will follow backup with me after that." *Id*.

On April 1, 2016, Ms. Binette received a guided fluoroscopic injection in her left shoulder. Pet. Ex. 5 at 13. She rated her pre-injection pain as a 6/10 and her post-injection pain as 0/10. *Id*.

On April 22, 2016, Ms. Binette presented to Dr. Goumas for a follow-up of her left shoulder symptoms. Pet. Ex. 5 at 12. Dr. Goumas assessed Ms. Binette's presentation as consistent with adhesive capsulitis. *Id*. He noted that Ms. Binette's last steroid

7

injection had only provided her with four hours of complete relief.  While she was still experiencing some relief from the injection, she continued to complain of lingering pain in her left shoulder.  Dr. Goumas referred Ms. Binette to physical therapy and prescribed Meloxicam.  *Id*.

On April 25, 2016, Ms. Binette presented to Apply Therapy Services in Bedford, New Hampshire for an initial evaluation.  Pet. Ex 5 at 4.  After an assessment of her symptoms, it was recommended that she attend physical therapy in conjunction with a home exercise program, three times a week for six weeks.  *Id*. at 6.

Ms. Binette attended physical therapy at Apple Therapy Services on April 27, May 2, 4, 9, 11, 16, 18, 23, 25, 2016.  By June 1, 2016, Ms. Binette reported a 20% improvement since starting therapy.  Pet. Ex. 7 at 41.  Her maximum pain decreased from a 10/10 to 8/10 with 0/10 at times.  Ms. Binette's range of motion "ha[d] improvement steadily", although she was very limited with strengthening and attempts to increase her strength led to reports of elevated pain.  It was recommended that she continue with her current treatment plan.  *Id.* at 41.  Ms. Binette continued with physical therapy sessions on June 1, 6, 8, 13, 15, 20, 2016 (16th session).

On September 28, 2016, Ms. Binette returned to Dr. Piscopo for a follow up of her left shoulder.  Pet. Ex. 9 at 1.  She reported continued soreness of her left shoulder with use of her arm.  *Id*.  Ms. Binette stated that reaching and lifting were very limited due to her pain and restricted movement.  *Id*.  Upon examination, Dr. Piscopo noted some mild to moderate tenderness over the subacromial interval.  The range of motion of her left shoulder was limited in certain planes, although she had good strength with moderate discomfort.  Dr. Piscopo advised Ms. Binette that her continued symptoms were "not unexpected for the nature of her condition."  He stated that he anticipated that her shoulder symptoms would gradually decrease in intensity, but that it was unclear how long it would take before she ultimately got complete resolution of her symptoms.  *Id*.  Dr. Piscopo advised that Ms. Binette continue with home exercises if she did not feel she was benefiting from formal physical therapy and if she failed to show improvement, then a further workup with repeat MRI would be considered.  *Id*. at 2.  Ms. Binette received another steroid injection during this visit.

On January 13, 2017, Ms. Binette returned to Dr. Piscopo for a follow up.  Pet. Ex. 10 at 1.  She reported that the last steroid injection helped for a little while, but not long and she continued to experience soreness about her shoulder region, especially with extended use of her left arm.  *Id*.  On examination, there was mild tenderness on palpation over the AC joint and the subacromial interval.  *Id*. at 2.  Dr. Piscopo noted some mild weakness and moderate pain to resisted shoulder abduction, but Ms. Binette demonstrated full passive internal rotation without pain.  In the assessment, Dr. Piscopo advised that with petitioner's continued symptoms, a further workup with an MRI scan would be appropriate to assess her rotator cuff to look for evidence of either progressive change or potential healing of the cuff.  *Id*.  Regarding prognosis, he stated that recovery is unpredictable and that if her symptoms continued to fail to resolve over time, she may need surgical treatment to debride the involved area and possibly repair the rotator cuff.  *Id*.

On January 23, 2017, Ms. Binette underwent another MRI of her left shoulder.  Pet. Ex. 23 at 1-2.  The results showed "[a] very small amount of edema … seen in the deltoid posteriorly…"  *Id*. at 2.  The MRI also showed subacromial and subdeltoid

8

bursitis, mild supraspinatus tendinosis and mild infraspinatus and subscapularis tendinosis.  *Id*.  Bursal surface fraying of the distal supraspinatus and infraspinatus was also seen.  *Id*.  There were no definite findings for capsulitis.  *Id*. at 2-3.

By April 27, 2017, Ms. Binette returned to Dr. Piscopo complaining that while her shoulder had been doing "ok" overall, over the past three weeks, her shoulder pain had increased.  Pet. Ex. 11 at 3.  Ms. Binette stated that her pain was not severe but she had been noting a gradual worsening of her symptoms and she requested another steroid injection.  *Id*.  Dr. Piscopo again noted mild tenderness of the subacromial interval laterally with mild tenderness over the more anterior aspect of the subacromial interval.  *Id.* at 4.  He felt that another steroid injection at this point would be reasonable and proceeded with the procedure.  *Id*.

On July 27, 2017, petitioner presented to Dr. Piscopo for another follow up regarding her left shoulder.  Pet. Ex. 14 at 2.  Ms. Binette reported that since her last visit, the feeling of stiffness that she was having had largely resolved.  *Id*. at 2-3.  She reported that she still experienced sharp pain with certain movements and she remained unable to reach fully overhead, but "finds functionally it does not limit her all that much."  *Id*. at 3.  Dr. Piscopo noted that Ms. Binette had mild tenderness diffusely about the subacromial interval, but no significant tenderness elsewhere about her shoulder including no significant tenderness over the AC interval.  Active abduction was limited to 90° but passive internal rotation as well as passive external rotation were within normal limits.  Good strength was noted and Ms. Binette reported no pain to resisted shoulder internal rotation or resisted shoulder external rotation.  *Id*.  Dr. Piscopo stated "I advised the patient that at this point where she is not experiencing a lot of pain I do not feel that further intervention is indicated at this time."  *Id.*  He encouraged her to continue using her left arm and to work on gentle stretching exercises.  *Id*.  Regarding a prognosis, Dr. Piscopo stated that given the longevity of her symptoms, there was at least a moderate risk that this may be a condition that she continues to have some years in the future.  He encouraged her to continue to mobilize her left arm to tolerance and to return for a reassessment in three months.  *Id*.

Three months later, on October 26, 2017, Ms. Binette returned for her follow-up visit with Dr. Piscopo complaining that over the past few weeks, her pain symptoms worsened.  Pet. Ex. 14 at 11.  She stated that she had not been engaging in any unusual activity but the pain forced her to restrict the use of her arm and was interfering with her sleep.  *Id*.  Dr. Piscopo noted a "significant flareup" about the shoulder region on his physical examination.  He recommended a repeat steroid injection to alleviate her symptoms.  *Id*. at 12.  Ms. Binette agreed and the steroid injection was administered.  *Id*.

On March 1, 2018, Ms. Binette returned for a follow-up visit with Dr. Piscopo.  Pet. Ex. 14 at 19.  She reported that her shoulder pain was now bothering her on a constant basis.  If she was careful with how she moved her arm, the pain was relatively mild, but any abrupt movement of her shoulder would cause marked pain.  *Id*.  Ms. Binette reported that her left shoulder motion had been reasonably maintained since the episode with the frozen shoulder, but she was frustrated at the chronic nature of her shoulder symptoms and was looking to discuss options, including surgery.  *Id*.  Dr. Piscopo noted that he did not see any evidence of any structural pathology for which surgery would be indicated.  *Id*.

On March 15, 2018, Ms. Binette followed up again with Dr. Piscopo.  Pet. Ex. 14 at 34.  Ms. Binette reported that her symptoms were unchanged from the previous visit.  *Id*. at 35.  She reported a "constant soreness about her shoulder, and use of her arm will seem to accentuate her symptoms.  Abrupt movements of her shoulder will cause more sharp pain."  *Id*.  On examination, Dr. Piscopo noted mild tenderness about the subacromial interval and anterior humeral head.  He also noted some reduced range of motion with external and passive internal rotation of the shoulder.  *Id*. at 36.  Dr. Piscopo reviewed the most recent MRI images and compared the results with Ms. Binette's February 2016 and January 2017 MRIs.  He noted that the current images continued to show an area of signal abnormality involving the supraspinatus that had extended slightly more distally.  *Id*.  He did not see any other abnormality of the shoulder.  He "advised the patient that at this time I do not see any other good options other than to manage her conservatively.  I advised her that the area of involvement is too broad, and extends to[o] deep into the rotator cuff to anticipate surgery for resection of the involved area, and there does not appear to be any other abnormality about her shoulder to explain her symptoms."  *Id.*  He instructed Ms. Binette to continue with her home exercises and to avoid strenuous use of her shoulder.  Ms. Binette was to follow up in three months.  *Id*.

On June 18, 2018, Ms. Binette returned to see Dr. Piscopo in follow up.  Pet. Ex. 14 at 57.  She reported that her left shoulder continued to feel sore and constant.  She reported that the pain seemed to be more severe and by the end of the day, the pain was worse than it was in the morning.  *Id*.  During this visit, Ms. Binette rated her shoulder pain at rest as a 5/10.  On examination, Dr. Piscopo noted "more pronounced tenderness today as I palpate over the area of the acromioclavicuar joint…She has good strength and only minor discomfort to resisted shoulder internal rotation as well as resisted shoulder external rotation."  Pet. Ex. 14 at 58.  Dr. Piscopo stated:

> I advised the patient that her findings today appear grossly unchanged from her recent office visits.  I advised that given her failure to respond to previous treatment I feel that it is likely that her condition is permanent.  I encouraged her to continue with gentle rotator cuff strengthening exercises to try to keep up rotator cuff as healthy as possible. We'll plan to reassess her in a further 3 months.

The most recent record of treatment is dated September 17, 2018, where Ms. Binette presented to Dr. Piscopo for a follow-up visit.  Pet. Ex. 19 at 1.  Ms. Binette reported that there was no significant change in her pain symptoms.  She reported constant soreness about her shoulder, but that her pain levels increased with activity.  *Id.*  On examination, there was no visible swelling or deformity.  *Id*. at 2.  Palpation revealed mild tenderness over the subacromial interval and anterior humeral head but no significant tenderness elsewhere about her shoulder.  *Id*.  Active forward elevation was limited to 135° and active abduction was limited to 70°.  *Id*.  Passive forward elevation was tolerated to 150° where it was limited by pain.  *Id*.  Ms. Binette demonstrated "good strength" of her left shoulder with "only minor discomfort to resisted shoulder internal rotation as well as resisted external rotation."  *Id*.  Dr. Piscopo advised that there did not appear to be any significant change to her shoulder since the previous assessment three months prior.  He encouraged Ms. Binette to continue with her isolated rotator cuff exercises and to follow up in three months.  *Id*.  The assessment was rotator cuff tendinosis of the left shoulder.  *Id*. at 3.

10

Ms. Binette filed a letter from Dr. Piscopo dated October 18, 2018. Pet. Ex. 20 at 1. In the letter, Dr. Piscopo confirmed that Ms. Binette was under his care and that "[m]assage and chiropractor could be helpful to manage[] her pain symptoms." *Id*.

### III.     Impact on Personal Life

Ms. Binette stated that she has suffered "excruciating pain and significant limitations in her range of motion from the time of her vaccination on October 22, 2015." Petitioner's Prehearing Brief ("Pet. Brief") at 10. Even at rest, she rated her pain level at a 5/10. *Id*. Ms. Binette also noted that she is not a candidate for surgery and that according to Dr. Piscopo, her injury is permanent. *Id*. Ms. Binette stated that she suffers from a constant lack of sleep. She described in her affidavit how every aspect of her life is affected by the injury. *Id.* at 11.

Prior to the October 22, 2015 flu vaccination, Ms. Binette participated in Bikram yoga four to five times a week. Pet. Ex. 8 at 1. After receiving her vaccination, she is no longer able to attend yoga and she states that she is unable to perform basic tasks. *Id*. After attending physical therapy, Ms. Binette attempted to return to yoga, but because she had to make so many modifications during class, she felt that she was no longer benefiting from the class. *Id.* Ms. Binette averred that she has gained 25 pounds since the time of vaccination due to her inactivity and inability to exercise. *Id*. At the time her first affidavit was filed, Ms. Binette stated that she continued to attend physical therapy twice a week to rebuild her strength. *Id.* at 2. To minimize the pressure on her left shoulder while sleeping, Ms. Binette purchased an inflatable device to place under her mattress. She also attends monthly massage therapy sessions to help alleviate the pain in her left shoulder. *Id*. Ms. Binette stated that because of the vaccination, she can no longer participate in activities such as kayaking, canoeing, and swimming overhand.

During her hearing testimony, Ms. Binette explained that she is scheduled to be married in October of 2019. Tr. 14. She testified that dress shopping was difficult for her; that the process was "painful, complicated, and took four people" to help her change into and out of dresses. *Id*. at 15.

At work, Ms. Binette testified that her employer conducted an ergonomic assessment in order to create a workspace that would accommodate her injury. Tr. 17. She stated that her job is not in jeopardy and her employer has been very accommodating, but her injury does affect her job. *Id*.

During the damages hearing, Ms. Binette's fiancé, Joshua Creighton, testified. Tr. 85-96. He stated that he frequently observes Ms. Binette in pain due to her shoulder injury. Tr. 87. He described how he must assist her in daily tasks such as dressing, bathing, shaving, laundry and buckling her seatbelt. Tr. 87-88. Mr. Creighton also described his concerns for their future if Ms. Binette's shoulder injury continues, such as her ability to care for their children. Tr. 93-94.

Ms. Binette filed the affidavit of her co-worker, Ms. Joann Lanoi[5], who was present the day that Ms. Binette received her flu vaccination on October 22, 2015. Pet. Ex. 12 at 1. Ms. Lanoi averred that she observed Ms. Binette in pain when she attempted to lift overhead or remove heavy objects while at work. Ms. Lanoi recalled that Ms. Binette had to rearrange her work station to accommodate her shoulder injury. *Id*.

Ms. Binette also filed the affidavit of a vocational expert, Ms. Roberta J. Hurley. Pet. Ex. 13. Ms. Hurley stated she spoke with Ms. Binette on September 19, 2017, to discuss any challenges Ms. Binette experienced with her employment as a Collections Specialist for St. Mary's Bank. Ms. Binette reported to Ms. Hurley that she was experiencing constant pain making it uncomfortable for her to sit for long periods. Her position requires that she sit all day long, and Ms. Binette described how she had to "shift" and "move" because the pain radiated from her shoulder and arm and affects her back. Ms. Binette stated that she had to rely on others to move her files, many of which are heavy. *Id*. Ms. Binette also reported that due to the lack of sleep which results from her shoulder injury, she experiences fatigue which makes it difficult for her to work 40 hours per week. *Id*. Ms. Hurley stated that in her professional opinion, "these issues will more likely than not impact Courtney's ability to perform her job in the future. If her pain persists at current levels, and if her fatigue continues to be an issue, there is a reasonable likelihood that she will be unable to perform the duties of a Collections Specialist at St. Mary's Bank. Her loss of employment will result in lost wages." *Id*.

## IV.  Contentions of the Parties

### A. Petitioner's Position

Petitioner proposes an award of $250,000 for past pain and suffering, the most allowed for pain and suffering cases in the Vaccine Program under the statutory cap.[6] Petitioner's Brief Regarding Damages ("Pet. Brief") at 1. Petitioner states that her injury is permanent and one that is not capable of being surgically repaired. *Id*. at 1-2. She argues that her current pain levels are between 5/10 at rest, a 10/10 with activity, and her symptoms are expected to plague her for the rest of her life. *Id*. at 2.

---

[5] Ms. Lanoi also testified during the damages hearing. Tr. 96-103. Her testimony is consistent with the information contained in her affidavit. *Id*.

[6] Petitioner proposes that SIRVA claims should be categorized based on severity and duration as "rough guidelines" for awarding compensation. (ECF No. 48, p. 23.) Specifically, petitioner asserts that appropriate awards for pain and suffering would be as follows:

| | |
|---|---|
| Injuries lasting six months: | $100,000 - $125,000 |
| Injuries from six months to one year: | $125,000 - $160,000 |
| Injuries lasting one year to two: | $160,000 - $190,000 |
| Permanent residua (non-debilitating): | $175,000 - $250,000 |
| Permanent residua (debilitating): | over $250,000 (reduced by cap to $250,000) |

(ECF No. 48, p. 23-24.) The undersigned notes that, as described below, these proposed awards are significantly higher than what has *typically* been awarded in SIRVA cases. *See Kim, infra*.

12

Consequently, petitioner also seeks an award for future pain and suffering of $20,000.00 per year for the remainder of her life, an amount to be reduced to net present value. *Id*. at 2. Ms. Binette states that she is making no claim for lost wages but also seeks an award for past unreimbursable expenses in the amount of $7,101.98.

### B. Respondent's Position

Respondent proposes a pain and suffering award of no more than $87,500.00. Respondent's Brief on Damages ("Resp. Brief") at 1 (ECF No. 44). At the time of briefing, respondent did not dispute petitioner's claim for $3,373.12 for past unreimbursable expenses as her request was "well-supported and related to her right SIRVA". However, respondent has not agreed to petitioner's most recent request for unreimbursable expenses of $7,101.98.[7] Resp. Brief at 1; Joint Status Report filed Dec. 20, 2018 (ECF No. 57).

In his brief, respondent argues that petitioner's medical records demonstrate that her initial complaints of left shoulder pain were relatively mild. Resp. Brief at 2. Although Ms. Binette continued to have shoulder pain into 2017, respondent notes that her complaints to her doctor were that her pain was not severe. *Id.*

Respondent also discusses several pain and suffering decisions arguing that the degree of severity of the injuries in those cases, comparatively speaking, was greater than Ms. Binette's and the award of damages for pain and suffering were substantially less than the award petitioner is seeking in this case. Resp. Brief at 6. Respondent states that "t[]his is especially true in light of recent SIRVA pain and suffering damages awards issued by the Court. For those cases in which petitioners did not undergo surgery, but rather treated conservatively, in similar fashion to how petitioner here treated her left shoulder, awards have ranged from $60,000.00 to $94,900.99 in pain and suffering." *Id*. (citations omitted).

### V.   Discussion and Analysis

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *See I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125 at *9 (Fed. Cl. Spec. Mstr. May 14, 2013), *originally issued* Apr. 19, 2013 ("*I.D.*") ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-172V, 1996 WL 300594 at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Compensation awarded pursuant to the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury . . . not to exceed $250,000." § 15(a)(4). In determining an award for pain and suffering and emotional distress, it is appropriate to consider the severity of injury and awareness and duration of suffering. *See I.D.*, 2013 WL 2448125 at *9-11, (*citing McAllister v. Sec'y of Health & Human Servs.*, No. 91-103V, 1993 WL 777030 (Fed. Cl. Spec. Mstr. Mar. 26,

---

[7] Respondent did not provide any specific reason for his rejection of petitioner's additional requested expenses.

1993)), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995). In evaluating these factors, the undersigned has reviewed the entire record, including medical records, affidavits submitted by petitioner and others, and hearing testimony.

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering this case. *See, e.g. Jane Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, the undersigned also may rely on her own experience adjudicating similar claims. *See Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, it must be stressed that pain and suffering is not determined based on a continuum. *See Graves*, 109 Fed. Cl. 579 (2013).

In *Graves*, the Court rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. The Court noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. At 590. Instead, the Court assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595.

In that regard, the undersigned notes that over the past four years the Special Processing Unit ("SPU") has amassed a significant history regarding damages in SIRVA cases. In *Kim v. Sec'y of Health & Human Servs.*, the undersigned explained that after four years of SPU experience, 864 SIRVA cases were resolved informally as of July 1, 2018. No. 17-418V, 2018 WL 3991022, at *6 (Fed.Cl.Spec.Mstr. July 20, 2018). The undersigned noted that the median award for cases resolved via government proffer is $100,000.00 and the median award for cases resolved via stipulation by the parties is $71,355.26.[8] *Id*. In *Kim*, the undersigned rejected petitioner's citation to a few isolated proffers and noted that "to the extent prior informal resolutions are to be considered, the undersigned finds that the overall history of informal resolution in SPU provides a more valuable context for assessing the damages in this case. Since it reflects a substantial

---

[8] The undersigned further stressed that the "typical" range of SIRVA awards – meaning the middle quartiles – is $77,500.00 to $125,000.00 for proffered cases and $50,000.00 to $95,228.00 for stipulated cases. The total range for all informally resolved SIRVA claims – by proffer or stipulation – spans from $5,000.00 to $1,500,000.00. *Kim v. Sec'y of Health & Human Servs.*, No. 17-418V, 2018 WL 3991022 at *6 (Fed.Cl.Spec.Mstr. July 20, 2018). Importantly, these amounts represent total compensation, and typically do not separately list amounts intended to compensate for lost wages or expenses. *Id*. The undersigned noted that "[t]hese figures represent four years' worth of *past* informal resolution of SIRVA claims and represent the bulk of prior SIRVA experience in the Vaccine Program. However, these figures are subject to change as additional cases resolve and do not dictate the result in this or any future case. Nor do they dictate the amount of any future proffer or settlement." *Id*.

history of resolutions among many different cases with many different counsel, the undersigned is persuaded that the full SPU history of settlements and proffers conveys a better sense of the overall arms-length evaluation of the monetary value of pain and suffering in a typical SIRVA case."[9]  *Id*. at *9.

Additionally, since the inception of SPU in July 2014, there have been a number of reasoned decisions by the undersigned awarding damages in SPU SIRVA cases where the parties were unable to informally resolve damages.  Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering.  To date, these decisions are[10]: *Desrosiers v. Sec'y of Health & Human Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses); *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $94,900.99 for pain and suffering and $862.14 in past unreimbursable medical expenses); *Marino v. Sec'y of Health & Human Servs.*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Knauss v. Sec'y of Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Collado v. Sec'y of Health & Human Servs.*, No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses); *Kim v. Sec'y of Health & Human Servs.*, No. 17-418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 for medical expenses); *Dobbins*, No. 16-854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 for medical expenses); *Cooper v. Sec'y of Health & Human Servs.,* No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses).

In their respective briefs, the parties compared the instant case to *Desrosiers, Dhanoa, Marino,* and *Knauss*.[11]  Additionally, petitioner cited two decisions issued by other special masters in prior SIRVA cases.[12]  In *Anthony v. Sec'y of Health & Human Servs.*, petitioner was awarded $248,540.00 for pain and suffering.  No. 14-680V, 2016

---

[9] Petitioner cited the following informal resolutions: *Deak v. Sec'y of Health & Human Servs.*, No. 14-668V ($160,000.00); *Jenny v. Sec'y of Health & Human Servs.,* No. 14-338V ($140,000.00); *Brand v. Sec'y of Health & Human Servs*, No. 12-549 ($178,225.98); and *Strobel v. Sec'y of Health & Human Servs*, No. 15-1375V ($184,750.00).  Additionally, petitioner sought to distinguish the informal resolutions in *Curtis v. Sec'y of Health & Human Servs.*, No. 16-85V ($91,217.75) and *Ponsness*, No. 15-826V ($95,000.00).

[10] This list is limited to those decisions which have been made public at the time of issue of this decision.

[11] Petitioner also cited to *Collado v. Sec'y of Health & Human Servs.,* No. 17-255V, and *Kim v. Sec'y of Health & Human Servs*., No. 17-418V.

[12] Petitioner also cited several intussusception cases; however, in the undersigned's view, such cases are not sufficiently analogous to be instructive.

15

WL 1169147 (Fed. Cl. Spec. Mstr. Mar. 2, 2016).[13] In *Courbois v. Sec'y of Health & Human Servs.*, petitioner was awarded $142,794.40 for pain and suffering. No. 13-939V, 2016 WL 2765092 (Fed Cl. Spec. Mstr. Apr. 20, 2016).[14]

### A. Determining Petitioner's Award of Pain and Suffering in This Case

The undersigned is mindful of all the above; however, in determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases. Upon the undersigned's review of the complete record in this case and in consideration of the undersigned's experience in evaluating SIRVA claims, the undersigned finds that an award of $130,000.00 for petitioner's actual pain and suffering and an additional $1,000.00 yearly for her future pain and suffering for the duration of her life expectancy (reduced to net present value) is appropriate in this case.

In the experience of the undersigned, awareness of suffering is not typically a disputed issue in cases involving SIRVA. In this case, neither party has raised, nor is the undersigned aware of, any issue concerning petitioner's awareness of suffering and the undersigned finds that this matter is not in dispute. Thus, based on the circumstances of this case, the undersigned determines that petitioner had full awareness of her suffering.

#### a. Severity of the Injury

Ms. Binette argues that she has suffered excruciating pain and significant limitations in her range of motion since the time she received the flu vaccination on October 22, 2015. Pet. Brief at 10. She argues that her medical records demonstrate that her pain is still extremely high, even at rest. *Id*. She notes that her orthopedist has categorized her injury as permanent and inoperable. *Id*. at 14. Ms. Binette states she has endured five cortisone injections, multiple rounds of physical therapy and there is nothing else that can be done for her. *Id.*

The undersigned finds that Ms. Binette testified credibly that her condition was very painful. Additionally, the contemporaneous records include notations which identify high levels of pain. Ms. Binette reported her left shoulder pain to her medical provider 15 days after vaccination. Pet. Ex. 3 at 18. She rated her pain at this time as a 10/10. Pet. Ex. 8 at 2. During this initial presentation, she exhibited a decreased range of

---

[13] The decision issued in the *Anthony* case did not address the factors that contributed to the special master's award. The special master had previously ruled from the bench following a damages hearing.

[14] Like *Anthony*, the special master in *Courbois* had made a prior oral ruling and the factors contributing to the special master's award were not disclosed.

16

motion of her left shoulder and tenderness and she was assessed with acute bursitis. Pet. Ex. 3 at 21. Ms. Binette underwent two full rounds of physical therapy. Pet. Ex. 4; Pet. Ex. 5, 7. Ms. Binette also underwent two MRIs of her left shoulder, both of which yielded abnormal findings. The first MRI, dated February 21, 2016, demonstrated "tendinopathy of the supraspinatus tendon infraspinatus tendon subscapularis tendons." Pet. Ex. 2 at 8. A second MRI dated, January 23, 2017, demonstrated edema, subacromial and subdeltoid bursitis, mild supraspinatus tendinosis and mild infraspinatus and subscapular tendinosis. There was evidence of bursal surface fraying of the distal supraspinatus and infraspinatus. Pet. Ex. 23-1-2. Ms. Binette received five cortisone injections to her left shoulder to treat her shoulder pain, all of which provided temporary and limited relief. Pet. Ex. 2 at 5; Pet. Ex. 5 at 13; Pet. Ex. 9 at 2; Pet. Ex. 11 at 4; Pet. Ex. 14 at 2.

The undersigned also acknowledges that Ms. Binette suffered a flare up of her symptoms as documented in Dr. Piscopo's records in or around October 2017. Pet. Ex. 14 at 11. At this time, Ms. Binette reported that her shoulder pain was bothering her on a constant basis. Pet. Ex. 14 at 19. Any abrupt movement of her shoulder caused marked pain. *Id.* Ms. Binette's condition continued to persist to September 2018 where Dr. Piscopo opined that he felt that Ms. Binette's symptoms had plateaued and that her condition was permanent. Pet. Ex. 14 at 58, 61. Dr. Piscopo opined that he did not see any structural pathology for which surgery would be indicated as the area of her shoulder was too broad and extended too deep into the rotator cuff for surgery. Pet. Ex. 14 at 36.

Ms. Binette is young. She was 24 years old at the time of vaccination and 27 years old when she testified at the hearing. Tr. 21. At the damages hearing, she rated her pain level at a seven out of 10 during the hearing, a higher level than normal because the travel to the hearing had exacerbated her pain. Tr. 11-12. She stated that on occasion, her pain levels rise above a seven due to weather changes or her sleeping position. Tr. 12. Ms. Binette stated that her pain level can reach as high as a 10, but never goes below a five. Tr. 12. Ms. Binette stated that she has managed her life around her shoulder pain. Tr. 12.

### b. Duration of the Suffering

#### i. Past Pain and Suffering.

As described above, the undersigned finds that there is evidence that Ms. Binette suffered moderate to severe pain from the time of vaccination up to and until October 2017, a period of approximately two years. The undersigned acknowledges that during this time, Ms. Binette suffered episodes of severe pain, mostly in conjunction with increased use and activity of the affected shoulder. From October 2017 to the present, (approximately 14 months) the undersigned finds that petitioner suffered an increased level of pain. Dr. Piscopo opined that Ms. Binette's shoulder condition was likely permanent and surgically inoperable. Pet. Ex. 14 at 58; Pet. Ex. 14 at 36-49. Based on

17

Dr. Piscopo's assessment, the undersigned finds that Ms. Binette's current levels of pain are likely to continue as further discussed below.

Thus, in light of all of the above, the undersigned finds that $130,000.00 represents an appropriate award for petitioner's actual or past pain and suffering.

### ii. Future Pain and Suffering

Ms. Binette argues that she is entitled to a "significant" award for future pain and suffering. At the time of the hearing, Ms. Binette was 27 years old. She stated that she "has a long life expectancy and will endure pain each and every day for the remainder of her life." Pet. Brief at 14. Her support for this argument is a statement from her orthopedist, Dr. Piscopo, who stated that "given [Ms. Binette's] failure to respond to previous treatment I feel that it is likely that her condition is permanent." Pet. Ex. 14 at 58. She therefore requests $20,000.00 per year for the rest of her life, nothing that the undersigned must cap her total award for pain and suffering at $250,000.00. Pet. Brief at 14.

Respondent's brief does not address petitioner's argument for an award for future pain and suffering. He simply proposes a global award for "past and future pain and suffering." Resp. Brief at 6. The undersigned notes, however, that at the time respondent's brief was filed, petitioner had not yet filed the medical record from Dr. Piscopo which states that he believes that Ms. Binette's shoulder injury is permanent.

There are only two reasoned SIRVA damages decisions that have awarded compensation for future pain and suffering: *Dhanoa v. Sec'y of Health and Human Serv.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) and *Curri v. Sec'y of Health & Human Servs.*, No. 17-432V, 2018 WL 6273562 (Fed. Cl. Spec. Mstr. Oct. 31, 2018). In *Dhanoa*, the special master awarded $10,000.00 for pain and suffering for the year immediately following the decision, but gave no award for subsequent years. 2018 WL 1221922 at *7. In *Curri,* taking into account petitioner's significant arm pain, her permanently reduced range of motion, and the unique challenges petitioner faced in her day-to-day life, the special master found that $550.00 per year to be an appropriate award for petitioner's future pain and suffering. 2018 WL 6273562 at *6.

In this case, the undersigned finds that Ms. Binette's prognosis regarding the ongoing nature of her pain and suffering is similar to that of the petitioner in the *Curri* case. *Curri*, 2018 WL 6273562. In *Curri*, the petitioner filed a record from her orthopedist stating that petitioner's left shoulder "had reached its 'maximum medical improvement,' leaving her with a permanent 'scheduled loss of use' of 22.5 percent of her left arm." *Id*. at *2. The special master awarded petitioner an award of $550.00 per year for her future pain and suffering considering petitioner's "significant arm and shoulder pain, her permanently reduced range of motion, and the unique challenges her shoulder injury creates in her day-to-day life as a working mother of three children. *Id*. at *7. In this case, there is a similar statement from Ms. Binette's orthopedist regarding the permanent nature of her shoulder injury. In Dr. Piscopo's most recent treatment record, he states, "I advised that given [Ms. Binette's] failure to respond to previous treatment I feel that it is likely that her condition is permanent…" Pet. Ex. 14 at 58.

Petitioner bears the burden of proof with respect to each element of compensation requested and the medical records are the most reliable evidence of petitioner's condition. *Brewer v. Sec'y of Health & Human Servs.*, 1996 WL 147722 at *22-23 (Fed.Cl.Spec.Mstr. Mar. 18, 1996); *Shapiro v. Sec'y of Health & Human Serv.*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections."). Based on the statement of Ms. Binette's orthopedist, the undersigned finds that an award of $1,000.00 per year for her life expectancy to be an appropriate award for petitioner's future pain and suffering. This amount is to be reduced to net present value.

### B. Award for Past Unreimbursable Expenses

Ms. Binette has provided documentation of past unreimbursed expenses in the amount of $7,101.98. Pet. Ex. 22-23. In the joint status report filed on December 20, 2018, petitioner stated that the parties were unable to agree on a final amount for petitioner's past unreimbursed expenses. Joint Status Report, dated December 20, 2018 (ECF No. 57). The undersigned has reviewed the documentation filed by petitioner to support her claim for her past unreimbursable expenses and finds all the requested expenses to be reasonable. The undersigned awards petitioner $7,101.98 for her past unreimbursable expenses.

## VI. Conclusion

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases. In light of the above analysis, and in consideration of the record as a whole, the undersigned finds that petitioner should be awarded $130,000.00 in compensation for actual (or past) pain and suffering and $1,000.00 per year reduced to net present value, for the rest of her life expectancy, for future pain and suffering. Ms. Binette's date of birth is June 15, 1991, and her remaining life expectancy is approximately 57 years. Thus, her future pain and suffering damages total approximately $57,000.00, prior to conversion to net present value.

**Therefore, Ms. Binette is awarded $130,000.00 for actual pain and suffering and $57,000.00 for future pain and suffering. In addition, the undersigned finds (with the agreement of the parties) that petitioner is entitled to compensation for $7,101.98 for her past unreimbursed expenses.**

**The parties are to file a joint status report no later than by <u>Friday, March 29, 2019</u>: (1) converting the undersigned's award of future pain and suffering to its net present value, and (2) reporting on all outstanding items of damages that remain unresolved, if there are any remaining issues. Once these issues have been resolved, a damages decision will issue.**

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Chief Special Master
